George L. Robinson and Ella L. Robinson v. Commissioner.
Robinson v. Commissioner
Docket No. 52595.
United States Tax Court
T.C. Memo 1956-193; 1956 Tax Ct. Memo LEXIS 98; 15 T.C.M. (CCH) 1014; T.C.M. (RIA) 56193; August 27, 1956
*98 James W. R. Brown, Esq., and R. B. Hamer, Esq., for the petitioners. William E. McCormick, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion The respondent determined deficiencies in petitioners' income tax and additions to tax for the years 1950 and 1951 as follows: Additions to Tax
Defi-
Sec.
Sec.
Sec.
Year
ciency
291(a)
293(b)
294(d)
1950
$1,091.36
$ 545.68
1951
3,256.82
$162.84
1,628.41
$983.31 The issues are (1) whether the amount of $6,695.89 is includible in the cost of certain houses sold by the petitioners in the years 1950 and 1951; (2) whether certain other payments made by petitioners in 1950 are includible in the cost basis of these same houses; (3) whether any part of the deficiencies for 1950 and 1951 were due to fraud with intent to evade tax; and (4) whether petitioners are liable for additions to tax under section 294(d)(1)(A) of the 1939 Internal Revenue Code for failure, due to willful neglect and not to reasonable cause, to make and file a declaration of estimated tax in the years 1950 and 1951, and, under section 294(d)(2) of the 1939 Code, for making substantial *99 underestimates of estimated tax in the years 1950 and 1951. Certain uncontested adjustments and concessions by the parties shall be given effect in the Rule 50 computation. Findings of Fact Some of the facts have been stipulated and they are hereby incorporated by this reference. George L. Robinson, hereinafter called the petitioner, and his wife, Ella L. Robinson, were residents of Omaha, Nebraska, during the years here involved. Petitioner and his wife filed joint income tax returns for the years 1950 and 1951 with the then collector of internal revenue for the district of Nebraska. Petitioner did not make or file a declaration of estimated tax for the year 1951. Petitioner used the cash receipts and disbursements basis for reporting income in the years 1950 and 1951. Petitioner, in the years 1950 and 1951, was in the business of building and selling houses in Omaha, Nebraska. In 1950 petitioner acquired a tract of land upon which he planned to build 21 houses. In July of that year, when 10 of the houses had either been constructed or were under construction, the petitioner entered into the following contract with Elmer J. Anderson for the construction of the remaining *100 houses: "BUILDING CONTRACT "OMAHA, NEBR DOUGLAS COUNTY. JULY 24th, 1950 "This contract made and intered [entered] into this 24th, Day of July by and between George L. Robinson the party of the first part a building contractor, and Elmer Anderson party of the second part a contract carpenter. To wit: The party of the first part agrees to hire the party of the second part to build Four or more houses on Forestlawn Ave, in the City of Omaha, Nebr On a set contract price of (One Dollar) $1.00 per square foot. Which includes all rough in work, kitchen built in's for cabnits, [cabinets] closets poles and shelves, laying of kitchen ply wood floors, to hang all doors, and do all inside trim work, install all insolation [installation] on side walls and attic. If there is a house with garage to be built the garage door is also to be installed. By party of the second part. Also laying of Asphalt shingles. "It is also agreed the party of the second part can draw (3/4th) Three Fourths, of the contract price on completion of the rough in of each house when completed. The balance to be paid when the House is finished. "Party of the first part agrees to furnish all materials for the *101 said Houses. "The party of the second part agrees to furnish to the party of the first part an Insurance Certificate of Publice [Public] Liability, and Compensation. "SIGNED (Signed) G. L. Robinson Party of the first part "Witness. (Signed) Elmer J. Anderson Party of the Second part." Anderson was not certain he could do the work at the contracted price but he agreed to work on four of the houses to determine whether or not he could go on at that price. Anderson began building the houses soon after the contract was made, and when three of the houses were near completion he notified petitioner that he could not do the work at the contract price of $1.00 per square foot and demanded $1.50 per square foot for the remaining houses. Anderson also insisted that the increased price be made retroactive to cover the first four houses as well. Petitioner made inquiries as to prices with other builders and then agreed orally to pay Anderson $1.50 per square foot on the remaining houses as well as on the first four houses. Anderson also agreed to do certain extra work, not required by the contract, on the 11 houses and on other houses owned by the petitioner, and the cost of this extra *102 work performed by Anderson was $2,175.89. The provisions in the contract relating to the method of payment were not followed by the parties to the contract. Anderson pressed the petitioner for payments at various times while the houses were being constructed and these payments were made by the petitioner as follows: July 29, 1950
$ 700
Aug. 5, 1950
1,500
Aug. 12, 1950
1,500
Aug. 19,1950
1,500
Aug. 26, 1950
1,500
Sept. 9, 1950
500
Sept. 23, 1950
1,000
$8,200
Petitioner refused to make any more substantial payments after September 23, 1950 to Anderson because Anderson had begun to drink excessively and some of Anderson's employees had notified petitioner that Anderson had given them bad checks. These employees were threatening to quit work and to file mechanic's liens against petitioner's property. Petitioner began to make payments for work done on the contract by making checks payable jointly to Anderson and to Anderson's employees. During the period from October 14, 1950 to November 18, 1950, the petitioner made payments by check payable to Anderson or to Anderson and his employees jointly amounting to $3,184.11. Anderson completed the work on *103 the houses and the extras in the latter part of December, 1950. Aproximately two or three weeks prior to the completion of this work, Anderson requested from the petitioner a loan of $6,000 to be secured by a first mortgage on a house owned by Anderson and his wife. On January 10, 1951, petitioner made a final settlement with Anderson for work done on the contract. This final settlement, including the additional fifty cents per square foot and the various extras, amounted to $6,695.89, and a check in this amount was made out by petitioner payable to Anderson. On that same day Anderson tried to cash this check at his bank in Benson, Nebraska, but the bank would not cash it for him. Anderson then notified petitioner, who suggested they meet at petitioner's bank, where Anderson succeeded in cashing the check. Ernest Tanner, the bank official who initialed the check prior to its cashing, had Anderson count the money in his presence and then suggested that Anderson open an account, which Anderson refused to do. Anderson left the bank with the entire proceeds of the check. Anderson did not report the receipt of the $6,695.89 in his Federal income tax return for the year 1951. Later that *104 same day, January 10, 1951, petitioner met Anderson and the latter's wife in an attorney's office to close the $6,000 loan from petitioner to Anderson previously arranged. Anderson and his wife executed a promissory note and a mortgage on a house. Anderson received a check for $1,771.23, with the balance of the loan used to pay off an existing mortgage on Anderson's house in the amount of $3,204.66, and to repay the petitioner for overpayments in the amount of $1,024.11 made to Anderson during the construction work. In 1951 petitioner made an additional loan of $1.500 to Anderson secured by a second mortgage on Anderson's house. Anderson defaulted in his payments on the mortgages and in 1952 the petitioner foreclosed the mortgages, had the premises sold at foreclosure sale, and had Anderson removed from possession. The decree of foreclosure was entered on November 8, 1952. Petitioner constructed a total of 21 houses during the year 1950. The houses were all of a similar size, each containing approximately 820 square feet, and the selling price of the houses ranged from $9,995 to $10,750. He sold 10 of these houses in 1950 and 11 in 1951. On his 1950 Federal income tax return the *105 petitioner deducted 10/21sts of the total cost of constructing these houses from the proceeds of the sale of 10 of the houses and on his 1951 return petitioner deducted 11/21sts of the total cost from the proceeds of sale of 11 houses. Petitioner included as a part of the total cost of constructing the 21 houses all checks issued to Anderson, his employees and subcontractors, during the year 1950 in the total amount of $11,384.11 and also included in the total cost the check issued to Anderson on January 10, 1951 in the amount of $6,695.89. Anderson constructed a twelfth house, containing approximately 850 square feet, for Robinson in 1951 and received payments in the amount of $850 for the work done by him. Anderson received additional payments amounting to $275 from the petitioner for extra work done on this house by Anderson. The payment made by the petitioner to Anderson on January 10, 1951 in the amount of $6,695.89, less the amount of $2,344.11 which represents overpayments made to Anderson, is includible in the cost of the houses constructed by petitioner in 1950. No part of the deficiencies in the years 1950 and 1951 was due to fraud on the part of the petitioner with *106 intent to evade tax. Petitioner's failure to make and file a declaration of estimated tax for the year 1951 was due to willful neglect and not to reasonable cause. Opinion MULRONEY, Judge: The real issue in this case is, as respondent states in his brief, "whether Anderson returned the proceeds of the check (January 10, 1951, in the sum of $6,695.89) to Robinson." Petitioner included this sum as a payment made to Anderson, who was his contract carpenter, for work done on 11 houses Anderson built for him. If it was such a payment it was a part of the cost basis for the houses. Respondent's position is that this payment to Anderson was fictitious and not in fact made; that Anderson cashed the check but immediately gave the money back to Robinson as part of a fraudulent scheme on the part of Robinson to evade the tax. The issue is one of fact to be decided from all of the evidence and facts and circumstances, and the decision is largely dependent upon whether we are to believe the story told by Robinson or the story told by Anderson. We start with the building contract of July 24, 1940, whereby Anderson agreed to build "Four or more" houses for Robinson at $1.00 per square foot; *107 the building to include "all rough in work, kitchen built in's for cabnits, [cabinets] closets poles and shelves, laying of kitchen ply wood floors, to hang all doors, and do all inside trim work, install all insolation [installation] on side walls and attic" and install garage door and lay asphalt shingles. Anderson proceeded to build 4 houses pursuant to this contract but as he said, before they were completed it became apparent to him he could not even meet his payroll at $1.00 per square foot. He said he started drinking and the record shows he issued a number of bad checks to his employees and soon Robinson started issuing many checks to Anderson's laborers payable to the laborer and Anderson, which checks were charged to Anderson. When these 4 houses were still uncompleted Anderson testified he went to Robinson and told him he "was losing money" and "running behind" and asked him to increase the compensation provided for in the contract. Anderson said he got a flat "no" from Robinson who said "he wouldn't increase it a dime * * * he would get somebody else to build them." This is where the stories told by Anderson and Robinson on the witness stand begin to differ. Robinson *108 said that when Anderson came to him "he said he absolutely couldn't build them for $1 a square foot * * * And he says, 'I have got to have at least $1.50 a foot.'" Robinson denies he gave Anderson a flat "no". He said he would have "to see about that * * * I am going out and get some more prices." Robinson said he inquired of other contractors as to the going price and there is some evidence of one other witness that, about this time, Robinson did make inquiry as to the price he would have to pay other contract carpenters to build his houses. One witness said he quoted Robinson a price of $1.25 to $1.35 per square foot for "ordinary carpenter labor" and he indicated it might be more depending on what you called carpenter work; whether it would include flooring, roofing, hanging doors, cabinet work, etc. Robinson said he had a conversation with Anderson a little later, the next time he came for a check, and he told Anderson to go ahead and build the houses and he would pay $1.50 a square foot. Anderson said he did build the houses, completing the four which were then unfinished, and seven more which were not even started at this time and later a twelfth at a different location, all *109 at $1.00 per square foot as provided by the original contract. Where does the truth lie at this point in the testimony of the two witnesses? Anderson had a contract which certainly did not require him to build more than four houses at $1.00 per square foot. Before he had completed these four he says he knew he was losing money and couldn't even meet his payroll. And yet he says he went ahead and built seven or eight more houses at the same $1.00 per square foot knowing he would lose more money. We think it likely he did receive some promise of additional compensation. We feel certain that Robinson did make inquiry about the price he would have to pay another contractor and the prices quoted to him were more than $1.00 a square foot. We do not believe Anderson would continue to build houses for Robinson in excess of the number provided in the contract at the same losing price stated in the contract. We believe the conversations did not result in a flat refusal to increase the compensation; that they did, as Robinson stated, result in an oral agreement to increase the price of $1.50 a square foot. We pass now to the events of January 10, 1951. Robinson testifies that on the morning *110 of that day Anderson came to his house to settle up for all the work he had done. He stated that after checking the records he and Anderson determined that the total amount of extras, including the fifty cents a foot addition, amounted to $6,695.89; and that he gave Anderson a check for that sum and Anderson left. Approximately one-half hour later Anderson telephoned to Robinson and stated he had tried to cash the check in his bank at Benson, a suburb of Omaha, and that the bank would not cash it for him. Robinson stated that he suggested Anderson deposit the check but Anderson stated he wanted cash. Robinson then stated that if Anderson wanted cash he would go down to his bank, the First National Bank in Omaha, and if Anderson would meet him there he would see that he got the check cashed. Robinson stated he then drove to the First National Bank and Anderson was there waiting for him. He stated he introduced Anderson to Mr. Tanner, an assistant vice-president of the bank, and told Tanner that Anderson had built some houses for him and he had given Anderson a check for final payment and Anderson wanted to get the check cashed but his own bank out in Benson would not cash the check *111 for him. After conversing with Robinson and Anderson for a few minutes. Tanner took the check and went with Anderson to the teller's window where Tanner initialed the check, asked Anderson how he wanted the money, and Anderson said he would like to have it in large bills. Robinson said that the teller then gave the money to Anderson and Tanner suggested that he count it and Anderson stepped over to a deposit counter, counted the money and put it in his pocket. He said there was a little more conversation then Tanner tried to get Anderson to open an account but Anderson refused saying he needed the money to pay bills. Anderson then left the bank with the money while he, Robinson, remained in the bank and visited with Tanner about another matter. Anderson's testimony on what occurred on January 10, 1951, is that Robinson came to his home and picked him up in his car on the morning of that day and requested Anderson to cash a check for $6,695.89 and to return the cash to Robinson. It appears that Robinson was making a $6,000 mortgage loan to Anderson and Anderson stated that Robinson told him as long as he was doing him a favor making this $6,000 mortgage loan he expected a favor in *112 return and he wanted Anderson to help him get this $6,695.89 out of the bank in a way that it would not be subject to income tax. Anderson stated he was reluctant to do this as he was concerned that he would have to pay income tax on it, but he said Robinson assured him that the Government wouldn't pay any attention to it and he believed him. Anderson stated that he and Robinson then drove to the bank in Benson where he went into the bank with the check leaving Robinson in the car. He said he was unable to cash the check in this bank, he returned to the car, and he and Robinson then drove to the First National Bank in Omaha where they conversed with Tanner who put an O.K. on the check. He said Tanner walked to the teller's window with him and he received the cash from the teller and he and Tanner and Robinson then walked over to a deposit table where they engaged in a conversation. He stated Tanner then stepped up the lobby a short distance to speak to another customer and that at this time he, Anderson, turned over the money to Robinson and he then left the bank alone and went home on the street car, arriving at his home around 11:30 in the morning. Which story is to be believed? *113 Robinson's story, as to meeting at his home with Anderson on the morning of January 10th, is corroborated by Mrs. Robinson. Robinson's story of what occurred in the bank is corroborated by Tanner, the assistant vice-president of the bank. He stated that he was standing between Anderson and Robinson at the deposit counter while Anderson counted the money, and he stated that no money was turned over to Robinson in his presence. He recalled the conversation wherein he tried to get Anderson to open an account with this amount of cash and Anderson's reply that he had to have the money to pay bills, and he said at the conclusion of this conversation Anderson left the bank and he was asked: "Q. And when he left the bank did he have with him the money? "A. I would say yes." Tanner was a completely disinterested witness, a high official of the bank and since he corroborates Robinson's version of the transaction, we are inclined to believe that is the true story of what occurred. We are somewhat fortified in this conclusion because of one other bit of testimony. It seems that Anderson and Robinson had planned to meet at a lawyer's office in Omaha sometime on that day where Anderson and *114 his wife were to execute a mortgage. Going on with Anderson's story of the day's transactions, we find him arriving at home approximately 11:30 A.M. He stated that Robinson drove over to his house sometime after lunch where he picked up Anderson and his wife and took them to the lawyer's office arriving there around 2 o'clock. They executed the mortgage and received the amount of the mortgage, less certain credits, from Robinson. Robinson's version of the mortgage incident is that he met Anderson and his wife in the lawyer's office at about 11:00 o'clock on the morning of January 10th where the mortgage was executed by Anderson and his wife and the mortgage settlement made. The mortgage was in evidence and by a stamp thereon of the register of deeds, Douglas County, Nebraska, it was received for recording at 11:23 A.M. on January 10, 1951. We have not related all of the evidence but enough has been stated, we think, to show that Robinson's version of the transactions of January 10, 1951, is supported by the stronger testimony. Anderson admittedly had an interest in telling the story he did relate, first to the internal revenue agents after they started checking on him, and then on *115 the witness stand. Anderson's story was not corroborated by anyone, not even by his wife, who, apparently, might have corroborated some portions of his story if what he says occurred on January 10, 1951 was the true account of the transactions of that day. We find that Anderson did not return the $6,695.89 or any portion of it to Robinson. Petitioner does not claim that the entire amount of the check, $6,695.89, is a part of the cost basis of the houses constructed in 1950. He concedes, on brief, that he overpaid Anderson in the amount of $2,344.11. We hold, accordingly, that only the difference between these two amounts, i.e., $4,351.78, should be included with the other payments made to Anderson in petitioner's basis for the houses. Our holding on this factual issue disposes of the respondent's contention that a part of the deficiencies in the petitioner's income tax for 1950 and 1951 was due to fraud with intent to evade tax. Petitioner did not make or file a declaration of estimated tax for the year 1951. Respondent determined that petitioner is liable for additions to tax under section 294(d)(1)(A) of the 1939 Internal Revenue Code for failure to make and file a declaration *116 of estimated tax without reasonable cause and under section 294(d)(2) for substantial underestimate of estimated tax. Petitioner argues that he should not be held liable for both penalties. We rejected this same contention, after a full analysis of the problem, in G. E. Fuller, 20 T.C. 308, affd. on other issues, 213 Fed. (2d) 102, and we have since abided by that decision in Fred N. Acker, 26 T.C. 107 (April 17, 1956) and John R. Rictor, 26 T.C. 913 (August 8, 1956). These cases are controlling here. Petitioner makes no attempt to show that his failure to make and file a declaration of estimated tax in 1951 was due to reasonable cause and not to willful neglect. We sustain the respondent's determination that petitioner is liable for additions to tax for the year 1951 under section 294(d)(1)(A) and section 294(d)(2) of the 1939 Internal Revenue Code. The parties have made certain concessions and stipulations which shall be given effect in the Rule 50 computation. Decision will be entered under Rule 50.